Swing, J.
These cases all involve the same question, and were brought to test the constitutionality of the act of the Legislature, passed April 24, 1896, 93 O. L,, p. 606, generally known as the waterworks bill.
This act, in brief, provides for the building of waterworks for cities of the first grade of the first class, and that bonds may be issued by said cities, to the extent of $6,500,000.00, if necessary for the completion of the same. The works are to be built for said cities by a Board of Commissioners appointed by the Governor of the State. These *120 'Commissioners are given full and complete control over the building of the works, and, when completed are to turn the same over to the officers of said cities having charge of the water-works. The Commissioners, under said act, have the power to .let the1 contract for the building of the works as an entirety or otherwise, as they may deem best, or the may contract for the building of the entire plant, and lease the same from the builders for a period of forty years, with privilege of purchase every ten years. The Commissioners may issue the bonds of the city to the extent of $6,500,000.00 for the building of the works,for which the plant itself is pledged, as well as the credit of the city.
. It is claimed that the law is unconstitutional upon several '.grounds:
First — That it is a law of general nature, and does not have a uniform operation throughout the state, and, therefore, violates sec. 26, art. 2, of the constitution..
There can be no doubt but that such a claim.might well be made upon the language used by the judges in the body of the opinion in the case of Hixson v. Burson, 35 Bull. 280; but we do not think the claim is supported by the syllabus of that case, which is the law of the case. But whatever doubt the language of the opinion in that case may have produced in the minds of judges and lawyers as to this question, we think has been dispelled by the recent decision of the Supreme Court in the following cases: State ex rel. Attorney General v. Baker, 35 Bull., 381; Hayes & Sons v. The City of Cleveland; Seifert et al. v. Weidner et al., and others, found in 35 Bull., 399.
These cases clearly show that the’ Supreme Court did not intend, in the Hixson case, to overrule a long line of cases of that court in similar cases to the one here in controversy.
They .uphold the classification of cities, and all laws which may apply to all cities of the same class are constitutional, provided the subject matter of the law is a proper *121 .subject for classification. What matters are proper for classification has not yet been determined by our Supreme Court. In the case of McGill vs. The State of Ohio, 34 Ohio St., 238, Judge Boynton says: “The term ‘law of a general nature,’ as employed in the constitution, has not as yet Teceived from this court an authorative definition, and none will be^attempted in the present case. The annunciation of the principles that govern each case as it arises is the better mode of arriving at its proper meaning and effect,”
In that case the court held that a law regulating the selection of jurors for the courts of Cuyahoga county, was not a law of a general nature within the meaning of Sec. 26, Art. 2, of the constitution.
In the case of the city of Cincinnati vs. Steinkamp, 35 Bull. 185, the Supreme Court decided that a law which provides that in all cities of the first grade of the first class (Cincinnati), buildings of three or more stories in height, not used for private residences exclusively, should be provided with fire escapes, was one of a general nature, and not having a uniform operation, was contrary to said section of the constitution. The'court, at page 187, says: ■“The suject of the statute under consideration is the protection of persons from the danger of fire. Protection of life and limb, it would seem, is not a local matter, but is a matter of general public interest, in which every person in the state coming within the category of people exposed to the dangers intended to be guarded against,is equally interested with every other such person, and it would appear to be as much the duty of owners of buildings answering to the description as to construction and occupancy of those named in the statute, to observe the humane directions of this act, whether located in one part of the state as another,”
In this case the court, as was said in the McGill case, supra, says: “It is not intended by this holding to overturn *122 earlier decisions of the court upon kindred questions. Each case stands, and must stand, upon its peculiar facts and circumstances.”
The Supreme Court,in the case of Falk, ex parte 42 Ohio St. 638,decided that a law which provided that ‘‘any person found in a city of the first grade of the first class, or within four miles of the corporate limits thereof, having in his possession any burglar’s tools, shall be deemed guilty of misdemeanor,” was a law of a general nature, within the meaning of Sec. 26, Art. 2, and, not having uniform operation throughout the state, was unconstitutional. Judge Okey, quoting from the decision of Judge Thurman, in Cass vs. Dillon 2 Ohio St. 607, says ‘‘The origin of this section is perfectly well known. The legislature has often made it a crime to do in one county,or even township, what it was perfectly lawful to do elsewhere, and had provided that acts even for the punishment of offenses should be in force, or not, in certain localities, as the electors thereof respectively might decide. It was to remedy this evil and prevent its recurrence that this section was framed.” In speaking of the act in controversy, the court proceeds to say: ‘‘It is not merely immoral, but plainly vicious; it is one of a very serious and dangerous character; it is not merely malum prohibitum, but malum in se, and it is a wrong to society, ■ not merely in Cincinnati, not merely in cities, but in every county, in every township, in fact, in each and every part of the state, and no reason can be given why it might not properly be made punishable by statute throughout the whole state as a criminal offense.”
Other cases of the Supreme Court might well be cited upon this question, but they do not conflict with these. These cases clearly show the view taken by that court of this provision of the constitution; and, while in each of these cases they say that they will not laydown any general rule as to its meaning, but will reserve to itself the right to *123 pass on every law as it comes before them, it seems to me that there is a rule deducible from these decisions, and that is, that whenever any law, directly operates upon and affects the rights, privileges and interests of the citizen, and there is no reason why it should not operate on all the citizens of the state alike, it is a law of a general nature within the meaning of this section of the constitution, and it should have a uniform operation throughout the state. But wherever a law relates to the government of cities and to the doing of corporate acts by said cities, and only indirectly affects the citizen, it is not a general law within the meaning of this section, although the subject matter, if applied to any portion of the state other than classified cities and incorporated villages, would be a law of a general nature. Such construction seems necessary in order to give effect to Sec. 6, Art. XIII, of the constitution. But whether we are right in this inference or not, we think there can be no question but what, under the recent decisions of our Supreme Court, supra, this law does not come within the inhibition of the constitution as to being a law of a general nature.
It is claimed that the law violates Sec. 1 of Art. XIII of the constitution, which provides “The General, Assemly shall pass no special act conferring corporate power.” And, in favor of this contention, the case of Herrmann et al. vs. The City of Cincinnati, 9 C. C., 357, is cited. In that case we held that the law under consideration was special, and that it conferred corporate power, for the reason that by its terms it related to the city of Cincinnati alone, and that by no possibility could it apply to any other city.
The present law, no doubt, under the ruling of our Supreme Court, confers corporate power; but we do not think it is special within the meaning of this section. At the time of the passage of the act, the only city that was expected to be affected by it, was the city of Cincinnati, but its terms *124 are general. Any other city which might come within the classification could avail itself of its provisions. It clearly comes within the language of the court as stated in Marmet vs. The State, 45 Ohio St. 66: “Tne law is not a special act. It is local and special as to the ends to be accomplished, but general in its terms and operation, applying to all cities o£ the first class. It is not limited to such city as may have been in that class and grade at the date of its enactment. At that time Cincinnati was the only city in the state answering to the description, but there is a possibility,not to say certainty, that other cities in the state will increase in population, so that they will pass into this grade, and when that happens, they will come within the provisions of this law. In this respect, the law differs essentially from that in review in the case of The State vs. Mitchell, 31 Ohio St. 592.”
To the same effect many other cases might be cited.
It is also claimed that this law conflicts with Sect. 6, Art. VIII of the constitution, which provides “The General Assembly shall never authorize any county, city,town or township, by vote of citizens or otherwise, to become a stockholder in any joint stock company, corporation or association whatever, or to raise money for or loan its credit to or in aid of any such company, corporation or association.” This claim is based upon the provisions of Sec. 8 of the act. In brief, it might be said that the previous sections provide for the construction or enlargement of water-worksby five commissioners, to be appointed by the Governor of the state, while Sec. 8 provides, in brief, that if the commissioners should deem it inexpedient or “inadvisable” to proceed to construct the works themselves, it authorizes them to contract for the construction of said works as an entirety with any person or company, and to lease the same from said constructing party upon such terms as may be agreed upon on the completion of the same, such lease not to be for a longer period than *125 forty years with privilege of a renewal, with the privilege on behalf of the city to purchase said works at the end of each period of ten years. It provides that if this action is taken, said commissioners may convey to said constructing party,any property of the city which may be necessary for the construction of said works. We are unable to see how, if the commissioners should conclude to have the works constructed in accordance with this provision, it would be in violation of this section of the constitution. The part of the section which is claimed to apply is this: “Or loan its credit to or in aid. of any such company, corporation, or association. ”
The evil that this section of the constitution was intended to prevent was of great magnitude, and was well understood by the framers of the constitution. If it were not for this provision, every municipality in the state would be in danger of financial ruin. The usual form assumed by this evil, is for municipalities, in order to increase their population, to give donations to manufacturing plants and railroads, to induce them to come to their places. It is hard for the citizen who has the good of his municipality at heart to resist the temptation which, in almost every instance, such schemes hold out for the benefit of his town or city. But if this were permitted, there would be no end to it, and the result would be that the taxpayers would be building all the factories and railroads, and yet not running the plants, but getting only such benefit as an increased population would bring them.
But it seems to us that this element is wholly lacking in this law. If the commissioners should deem it inexpedient to build the works themselves, it would not be for the purpose of benefiting or aiding a constructing party, but for the benefit of the city. As far as it applies to Cincinnati, we can very easily see why the commissioners might deem it to the advantage of the city to adopt this course. If the com *126 missioners should build the works, it would add $6,500,000, to the debt the city; and to that extent the credit of the city would be impaired. While, if a constructing party would build the works, it would have to furnish the money until such favorable time as the city might find in which to buy the plant. Whatever aid the constructing party would derive from this arrangement, would only be such as it might derive from its profits, if any, from the building and leasing of the works. 'There could be no more aid in this than is given to every party who constructs a street or any other improvement for the city.
But even if this section of the act is unconsitutional, we do not think it would invalidate the whole act; for it is a section separate and apart from the other sections, and they would stand unaffected by it.
It is further claimed that this law is administrative, and,. therefore, the Legislature exceeded its power in passing it, and that it comes within the recent decisions of the Supreme Court in the Paddack road case and others. We see no objection to the act on that ground. It is not administrative as to the manner of building the works. That is left to the commissioners. It is very exact and particular as to the making of the contracts, but that was clearly only intended as a protection to the people and a safeguard to the proper expenditure of the money. We regard this as entirely proper.
It is further claimed that this act must be construed together with an act passed April 24, 1896, 93 O. L. 605; that the two must stand or fall together, and that, taken together, the law is invalid for several reasons. One, that it is class legislation; another, that it is void because of inequality, and another, that it is the raising of a general revenue in an improper manner. These acts provide, by means of a sinking fund, for the ultimate paymentof the cost of the works from water rents, whereas, it is claimed, it *127 should be borne by the taxpayer. We passed on this question in the case of City ex rel. vs. The City, 11 C. C., p. 309, holding the acts of the Board of Administration lawful. We see no reason to change our opinion now. It seems to us more of a theory than a reality, that the consumers bear all the burden. Doubtless the most of the consumers are the owners of their property; and when, as it is here at present, landlords are seeking tenants, the water rent really comes out of the property-holders; for the water rent is always taken into consideration by the renter. But we see no reason why the water consumers, who get the benefit of the water-works, should not bear the burden.
Wm. M. Ampt, for plaintiff.
Fred. Hertenstein, City Solicitor and Paxton, Warrington, Boutet for the city.
In the case of Ampt vs. The City, supra, it was shown that under the present management of the water-works, the costs to consumers had been reduced at an average of over 12-| per cent., and that the rents were low and not oppressive. If this were to continue, there could be no just cause for complaint. If, however, the rents, in the future, were to become oppressive and exorbitant, the Courts doubtless then could afford relief.
Other objections were raised to the act, involving its constitutionality, which we have considered, but which we do not deem necessary to refer to in this opinion.
Upon the whole, we think the act valid. We have gone over the matter fully, and given it such careful consideration as we could, recognizing that it is a matter of very great public importance.
As a result of our conclusions, the several petitions will be dismissed.